**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X

OSHEÉ BAUGUS, individually and on
behalf of all others similarly situated,

                      Plaintiff,

              -against-

EVENT TICKETS CENTER, INC.,

                      Defendant.
-------------------------------------------------------------------------X

**24 Civ. 9552 (GHW) (GS)**

**OPINION & ORDER**

**GARY STEIN, United States Magistrate Judge:**

Plaintiff Osheé Baugus ("Plaintiff" or "Baugus") brings this action against

Defendant Event Tickets Center, Inc. ("Defendant" or "Event Tickets") alleging that

Event Tickets unlawfully failed to disclose service fees to Plaintiff and others

similarly situated in violation of New York Arts and Cultural Affairs Law §

25.07(4).  (Dkt. No. 1).  Event Tickets moves to compel Baugus to arbitrate his

claims under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, and stay this

action pending arbitration.  (Dkt. No. 20).  For the reasons set forth below,

Defendant's motion is **GRANTED**.[1]

---

[1] Courts "in this Circuit routinely 'conclude[] that a motion to compel arbitration and stay litigation pending arbitration is non-dispositive.'"  *Alvarez v. Experian Info. Sols., Inc.*, No. 19 Civ. 3343 (JS) (JMW), 2024 WL 3643269, at *6 (E.D.N.Y. Aug. 2, 2024) (quoting *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 227 n.1 (S.D.N.Y. 2020)); *see also Kumaran v. Kadlec*, No. 20 Civ. 3668 (GHW), 2024 WL 3346084, at *2 (S.D.N.Y. July 9, 2024) ("A motion to compel is a non-dispositive motion.").  Accordingly, the undersigned issues this decision as an Opinion and Order.

## BACKGROUND

### A.    Plaintiff's Allegations[2]

Baugus visited Event Tickets's website, www.EventTicketsCenter.com (the "Website"), on September 3, 2023, to purchase two tickets for a concert at Madison Square Garden.  (Compl. ¶¶ 9, 10).  On September 17, 2023, Plaintiff again used the Website to purchase one ticket to a show at the Mercury Lounge in New York City.  (*Id.*).  The Website serves as a ticket-resale marketplace where users can purchase tickets for concerts, sporting events, and other live performances.  (Pl. SOF ¶ 1; Def. SOF ¶ 1).

On each occasion, Baugus was warned on three different pages that the event "May Sell Out" or that "Inventory is limited".  (Compl. ¶¶ 12–14; Pl. SOF ¶¶ 3–5).  Once a consumer closes the third pop-up warning, they are able to view and select available seats for purchase, with ticket prices listed.  (Compl. ¶ 15).  After choosing the seats, the consumer sees an "estimated subtotal" that represents the number of tickets purchased multiplied by the advertised ticket price (*e.g.*, two tickets worth $68 each have an estimated subtotal of $136).  (*Id.* ¶ 16).  A message immediately

---

[2] The following facts are based on the allegations in Plaintiff's complaint, filed December 13, 2024 (Dkt. No. 1 ("Compl."), Plaintiff's Rule 56.1 Statement of Facts (Dkt. No. 26 ("Pl. SOF")), Defendant's Rule 56.1 Statement of Facts (Dkt. No. 24 ("Def. SOF")), the declaration of Plaintiff's counsel Stefan Bogdanovich (Dkt. No. 26 Ex. A ("Bogdanovich Decl.")), and the declarations and attached exhibits submitted in connection with Event Tickets's motion to compel arbitration from Doug Kruse, Event Tickets's Chief Information Officer (Dkt. No. 22 ("Krus Decl.")), and Eric Vikmanis, the "VP of Client & Product Management" of TicketNetwork, Inc., which has responsibilities for the policies appearing on Event Tickets's Website (Dkt. No. 23 ("Vikmanis Decl.")).

Screenshots of the Website, presented as Figures A–D, are taken from, respectively, Plaintiff's Complaint at 8 ("Figure 6"), Kruse Decl. Ex. A, Kruse Decl. Ex. B, and Plaintiff's brief in opposition to Defendant's motion to compel at 35.

below the estimated subtotal, in different font color, states that the amount is "[n]ot including fees." (Compl. ¶ 16; *see* Figure A). Below this message, the consumer is prompted to "continue to checkout." (*Id.*).



**Figure A**

When the consumer proceeds to the next page, the Delivery Page, the Website flashes another pop-up that the selected tickets will be held "for another 9:59 minutes." (Compl. ¶ 17; Pl. SOF ¶ 8). Once the pop-up is removed by clicking a "start" button, a red timer counts down in a box below a message to "HURRY!" (Compl. ¶ 17). The Delivery Page displays the same price as during seat selection and includes no indication that additional fees will be assessed. (*Id.*). Underneath a field to input one's email address, the Website auto-selects a box next to a notice stating "Yes, I want EventTicketsCenter.com to send me event updates and ticket

3

discounts.  Privacy Policy."  (Pl. SOF ¶¶ 11–12; *see* Figure B).  The words "Privacy Policy" are in blue and hyperlink to Event Tickets's Privacy Policy, which includes a copy of the subject arbitration agreement.  (Def. SOF ¶¶ 11, 18–19; Kruse Decl. ¶ 6; Vikmanis Decl. Ex. A).  Plaintiff unchecked this box during both purchases.  (Pl. SOF ¶ 13; Kruse Decl. ¶ 7).

**Figure B**

After entering their email, payment method, and delivery method, the consumer clicks a "PROCEED TO PAYMENT" button to move to the Checkout Page. (Compl. ¶ 18). Here, the summary box and timer remain, and the indicated price remains identical. (Compl. ¶ 19; Figure C). The consumer is asked to complete fields with their billing address, payment information, and ticket insurance preference. (Compl. at 10; Figure C). Then, at the bottom of the page, the Website indicates a new total price including "ticket, service, and delivery fees." (Pl. SOF ¶ 18, Figure C). During both purchases, Baugus alleges that he paid Event Tickets a service fee that had not been disclosed on any page prior to the Checkout Page. (Compl. ¶ 9).

An image of the full Checkout Page appears below (Figure C).[3]

---

[3] Plaintiff's Complaint alleges that "once the consumer enters his Billing Address a different, new total [ ] discreetly appears [directly below the Billing Address], including a "Service Fee" of $[X] per ticket." (Compl. ¶ 19 and p. 10 ("Figure 9")). The images of the Website presented by Defendant, however, do not include this information, nor do the parties address it thereafter. Accordingly, the Court refers to the layout presented by Event Tickets, which was identical to the layout evaluated in other cases discussed *infra* and was attested to by Kruse as how the page "appeared at all relevant times in September 2023." (Kruse Decl. ¶ 8). Plaintiff admitted Kruse's assertion in his response to Defendant's Rule 56.1 Statement of Facts (Dkt. No. 27 ¶¶ 15, 20) and has submitted no evidence to the contrary.



**Figure C**

6

Further down the bottom of the Checkout Page, the consumer clicks a "PLACE ORDER" button to complete the transaction.  (Pl. SOF ¶ 9; Bogdanovich Decl. ¶ 10; Figure C).  Immediately above the button, there is a statement in smaller, light gray text which states: "By clicking 'Place Order,' you are agreeing to EventTicketsCenter.com's terms & policies.  All sales are final."  (Pl. SOF ¶ 19).  The words "terms & policies" are in blue and hyperlink to Event Tickets's Terms & Conditions, which includes an identical copy of the arbitration agreement.  (Pl. SOF ¶ 20; Def. SOF ¶ 11).  Baugus alleges that many terms on the Checkout Page, including the notice with the "terms & policies," are initially off screen in default browser settings, and one must scroll down to see them.  (Pl. SOF ¶¶ 16–17; Bogdanovich Decl. ¶ 12).

A close-up image of the "PLACE ORDER" button and the two lines of text directly above it, including the notice linking to the "terms & polices," appears below (Figure D):

By clicking "Place Order", your credit card will be charged $319.44 USD which includes ticket, service, and delivery fees.
By clicking 'Place Order', you are agreeing to EventTicketsCenter.com's terms & policies. All sales are final.

PLACE ORDER

**Figure D**

Baugus commenced this action on December 13, 2024 against Event Tickets for violation of New York Arts & Cultural Affairs Law § 25.07(4), specifically alleging that the price displayed on Defendant's Website while selecting seats differs from the total price displayed after entering a billing address, due to the

addition of service fees and taxes.  (Compl. ¶¶ 17, 19).  He contends the Website runs afoul of the law's requirements that service fees for entertainment tickets be disclosed in "a clear and conspicuous manner," that the total price be displayed "prior to the ticket being selected for purchase," and that the ticket price "shall not be increased during the purchase process."  (*Id.* ¶ 20 (quoting N.Y. Arts & Cult. Aff. L. § 25.07(4)); *see also id.* ¶¶ 31–37).[4]

Plaintiff alleges that he was harmed by paying unlawful service fees for the three tickets he purchased from Event Tickets in September 2023.  (*Id.* ¶¶ 36–37).  He also alleges he was harmed by not receiving "all-in pricing at the outset of the transaction," which would have enabled him to compare the true cost of a ticket on the Website to prices offered by competing sites.  (*Id.* ¶ 38).  Defendant's actions, according to Plaintiff, allow it to "reduce price competition, distort the ticket marketplace, and cause consumers to overpay."  (*Id.*).

Accordingly, Baugus seeks, *inter alia*, damages for these harms and declaratory relief on behalf of himself and a putative class of similarly situated individuals located throughout the United States who purchased tickets from Defendant's Website and paid undisclosed service fees.  (*Id.* ¶ 22 and p. 16 ("Prayer for Relief")).

---

[4] The latter two requirements—that operators disclose the total ticket cost "prior to the ticket being selected for purchase" and not increase the cost "during the purchase process"—were added by the legislature in 2022.  The 2022 amendment was a response to a legislative investigation into potentially unfair practices in the live event ticket industry, culminating in a recommendation that "the total cost of a ticket, including the service fee, should be disclosed at the earliest stage of a transaction, i.e., 'when tickets are first viewed on a website.'" *Summerville v. Gotham Comedy Found., Inc.*, 765 F. Supp. 3d 293, 300–01 (S.D.N.Y. 2025) (quoting N.Y. COMM. ON INV. & GOV'T OPERATIONS, FINAL INV. REP.: LIVE EVENT TICKETING PRACS., S. 2021, at 27 (May 18, 2021)).

### B.    The Arbitration Agreement

Event Tickets's arbitration agreement is included within its Terms & Conditions ("Terms") and its Privacy Policy.  (Def. SOF ¶ 11; *see* Vikmanis Decl. Ex. B at 9–10 (the "Arbitration Provision")).[5]

The Arbitration Provision states that "[a]ny controversy, claim, dispute, or other action, arising out of or relating to the use of SITE, any order placed on SITE, or these policies including any dispute over the validity, enforceability or scope of this arbitration provision (a 'CLAIM' or 'CLAIMS') shall be resolved through binding arbitration[.]"  (Terms at 9).[6]  It specifies that the arbitration shall be "administered by the American Arbitration Association (the 'AAA') in accordance with its Consumer Rules."  (*Id.*).  The Arbitration Provision further highlights (in all caps) that "BY AGREEING TO ARBITRATE, USER IS GIVING UP THE RIGHT TO LITIGATE (OR PARTICIPATE IN AS A PARTY OR CLASS MEMBER) ANY AND ALL CLAIMS IN COURT BEFORE A JUDGE OR JURY."  (*Id.* at 10).

The Arbitration Provision includes an opt-out provision, which states in all caps:

> IF USER DOES NOT WISH TO BE BOUND BY THIS ARBITRATION PROVISION, USER MUST NOTIFY SITE IN WRITING WITHIN 30 DAYS OF THE DATE THAT USER PLACES AN ORDER ON [the Website].  USER'S WRITTEN NOTIFICATION TO SITE MUST INCLUDE USER's NAME, ADDRESS AND ORDER NUMBER AS WELL AS A CLEAR STATEMENT THAT USER DOES NOT WISH TO

---

[5] Based on the Court's review, the Terms & Conditions and the Privacy Policy are largely, if not completely, identical, except for their titles and different font sizes.  (*See* Vikmanis Decl. Exs. A, B). For ease of reference, when citing to the Arbitration Provision, the Court uses the version in the Terms & Conditions.

[6] "SITE" is defined as EventTicketsCenter.com, *i.e.*, the Website.  (Terms at 1).

9

RESOLVE CLAIMS WITH SITE THROUGH ARBITRATION. WRITTEN NOTIFICATION SHOULD BE MAILED TO SITE.

(*Id.*).

The Arbitration Provision also contains a class action waiver, which provides:

Any arbitration or trial of any CLAIM will take place on an individual basis without resort to any form of class or representative action ('CLASS ACTION WAIVER'). Regardless of anything else in this Arbitration Provision, the validity and effect of this CLASS ACTION WAIVER may be determined only by a court and not by an arbitrator. USER and SITE acknowledge that the CLASS ACTION WAIVER is material and essential to the arbitration of any disputes between the parties and is non-severable from the agreement to arbitrate CLAIMS. If the CLASS ACTION WAIVER is limited, voided or found unenforceable, then the parties' agreement to arbitrate shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the CLASS ACTION WAIVER. USER AND SITE ACKNOWLEDGE AND AGREE THAT UNDER NO CIRCUMSTANCES WILL A CLASS ACTION BE ARBITRATED.

(*Id.*).

Finally, the Arbitration Provision provides that Event Tickets is eligible to recover certain attorneys' fees and costs for a claim filed in contradiction to the agreed-upon arbitration terms. It states:

Should USER improperly file a CLAIM, SITE may recover attorneys' fees and costs up to US $1,000 from USER, provided that SITE has notified USER in writing of the improperly filed CLAIM, and USER fails to promptly withdraw the CLAIM after USER receives notice of improper filing from SITE.

(*Id.*).

Immediately preceding the Arbitration Provision, the Terms & Conditions contain a Governing Law clause specifying that "any controversy or claim arising out of or relating to the use of [the Website] will be governed by the laws of the State of Connecticut without regard to its conflict of law provisions." (Terms at 9).

10

### C.    Defendant's Motion to Compel Arbitration

Event Tickets responded to Baugus's Complaint on March 31, 2025 with the instant motion to compel arbitration (Dkt. No. 20), filed together with an accompanying brief (Dkt. No. 21 ("Def. Br.")), the Kruse and Vikmanis Declarations (Dkt. Nos. 22, 23), and a Rule 56.1 Statement of Facts (Dkt. No. 24).  Event Tickets argues that Baugus agreed to the Arbitration Provision through the purchase of his tickets, did not opt out of the Arbitration Provision, and is therefore required to resolve his individual claims through binding arbitration.  (Def. Br. at 1, 5–6).[7]

Baugus submitted his brief in opposition to Event Tickets's motion to compel on April 28, 2025. (Dkt. No. 25 ("Pl. Br.")).  Accompanying Baugus's brief was his Rule 56.1 Statement of Facts (Dkt. No. 26 ("Pl. Statement of Facts" or "Pl. SOF")), which included an affidavit from Baugus's counsel (Dkt. No. 26 Ex. A ("Bogdanovich Decl.")).  On the same date, Baugus filed his response to Event Tickets's Rule 56.1 Statement.  (Dkt. No. 27).  Event Tickets filed its reply brief (Dkt. No. 28 ("Reply")) and its response to Baugus's Rule 56.1 Statement (Dkt. No. 29) on May 12, 2025.

The parties also filed supplemental letters addressing recent judicial decisions issued after the briefing was completed.  (Dkt. Nos. 30–34).  These include two decisions involving motions by Event Tickets, based on the same Arbitration Provision it invokes here, seeking to compel arbitration of claims filed by consumers who purchased tickets on the Event Tickets Website.  In *Gershzon v. Event Tickets*

---

[7] Event Tickets also asserts that the Arbitration Provision precludes Baugus from pursuing his claims as a member of a class.  (Def. Br. at 1).

*Center, Inc.*, No. 24-CV-4142-RS, 2025 WL 2323355 (N.D. Cal. Aug. 12, 2025), the court granted Event Tickets's motion to compel arbitration. More recently, on March 5, 2026, the court in *Hernandez v. Event Tickets Center, Inc.,* No. 2:24-CV-1983-DAD-AC, 2026 WL 618252 (E.D. Cal. Mar. 5, 2026), denied a motion by Event Tickets to compel arbitration.

## LEGAL STANDARDS

The Federal Arbitration Act ("FAA"), which "reflects a liberal federal policy favoring arbitration agreements," *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (citations omitted), dictates that any contract containing a binding arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2. Section 3 of the FAA "provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration," *EEOC  v. Waffle House, Inc.*, 534 U.S. 754, 761 (2002), and Section 4 of the FAA provides that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement," 9 U.S.C. § 4. "A party has 'refused to arbitrate' within the meaning of Section 4 if it 'commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so.'" *Shenzhen Xingchen Xuanyuan Indus. Co. v. Amazon.com Servs. LLC*, 735 F. Supp. 3d 453, 461

12

(S.D.N.Y. 2024) (quoting *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004)).

"Arbitration is a matter of contract, and 'the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.'" *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 828 (S.D.N.Y. 2020) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). "To rule on a petition to compel arbitration, the Court must decide two main issues: '(1) whether the parties agreed to arbitrate, and (2) if so, whether the scope of the agreement encompasses the claims at issue.'" *Abuda v. Strongblock*, No. 22 Civ. 10869 (LTS) (BCM), 2023 WL 6294205, at *4 (S.D.N.Y. Sept. 27, 2023) (quoting *Cornelius v. Wells Fargo Bank, N.A.*, No. 19 Civ. 11043 (LJL), 2020 WL 1809324, at *3 (S.D.N.Y. Apr. 8, 2020)); *see Nat'l Union Fire Ins. Co. of Pittsburgh v. Belco Petroleum Corp.*, 88 F.3d 129, 135 (2d Cir. 1996).

The party seeking to compel arbitration "bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022). "Whether an arbitration agreement exists is a matter of state contract law." *Whyte v. WeWork Companies, Inc.*, No. 20 Civ. 1800 (CM), 2020 WL 3099969, at *3 (S.D.N.Y. June 11, 2020). "This burden does not require the moving party to show initially that the agreement would be *enforceable*, merely that one existed." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (emphasis in original).

13

"It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) (citation omitted). "These requirements assure that the judiciary can enforce the parties' mutually-agreed terms and conditions when one party seeks to uphold them against the other." *Id.* at 289. An agreement that has not been properly formed in this manner "is not merely an unenforceable contract; it is not a contract at all." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019). "And if it is not a contract, it cannot serve as the basis for compelling arbitration." *Id.*

"If the Court finds that the parties entered into an arbitration agreement, it must then determine 'whether the dispute at issue comes within the scope of the arbitration agreement.'" *Id.* (quoting *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002)). "A party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010).

"In deciding a motion to compel arbitration, the Court applies a 'standard similar to that applicable for a motion for summary judgment.'" *Silver v. Nissan-Infiniti LT, LLC*, 724 F. Supp. 3d 217, 222 (S.D.N.Y. 2024) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). As on a motion for summary judgment, the court therefore "consider[s] all relevant, admissible evidence submitted by the parties and . . . draw[s] all reasonable inferences in favor of the

14

non-moving party.'" *EX.CO Techs. Ltd. v. Empire Med. Grp.*, No. 22 Civ. 6383 (MKV), 2023 WL 5035175, at *2 (S.D.N.Y. Aug. 8, 2023) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). "'Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id.* (quoting *Meyer*, 868 F.3d at 74).[8]

## DISCUSSION

Event Tickets asserts that the Arbitration Provision—which mandates arbitration of all claims "arising out of or relating to the use of [the Website], any order placed on [the Website], or these policies"—requires Baugus to arbitrate his claims. (Def. Br. at 16; Terms at 9). In support, Event Tickets contends that the "plain terms of the arbitration agreement [ ] unequivocally cover Plaintiff's claim that the Website failed to display certain fees during the ticket-ordering process" in violation of New York Arts and Cultural Affairs Law § 25.07(4). (Def. Br. at 17). Additionally, Event Tickets contends that the Website put Baugus on "inquiry notice" of its Terms & Conditions and the Privacy Policy, including the Arbitration Provision, in three different ways. (Def. Br. at 1–2, 8–16; Reply at 2–14). Finally, Event Tickets argues that Baugus unambiguously manifested assent to these terms on two separate instances. (Def. Br. at 16; Reply at 13).

---

[8] Both parties invite the Court to decide the arbitrability issue as a matter of law on the basis of their papers. Neither has sought further development of the evidentiary record.

Baugus does not deny that his claims fall within the scope of the Arbitration Provision.  However, he argues that an agreement to arbitrate was never properly formed, and so he cannot be bound by the Arbitration Provision.  (Pl. Br. at 1–4). Baugus argues that the Website failed to put him on inquiry notice because the relevant hyperlinks could be easily missed and never gave him "the ability to agree."  (Pl. Br. at 7–11, 15–35).  Baugus further contends that he never affirmatively manifested assent to the Terms & Conditions or the Privacy Policy. (*Id.* at 11–15, 35–37).

### A.    Choice of Law

At the outset, the Court must consider which state's law applies.

Defendant argues, pursuant to the language of the Terms & Conditions, that Connecticut law governs the dispute.  (Def. Br. at 7).  However, Defendant also claims that "the laws of 'contract formation' do not 'vary meaningfully from state to state.'"  (*Id.* at 7 n.5 (quoting *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702–03 (2d Cir. 2023)).

Baugus disagrees in part.  He argues that because he is a New York resident bringing claims under New York law related to ticket purchases for an event in New York, and because Event Tickets has no connection to Connecticut other than the contractual provision, New York law applies.  (Pl. Br. at 5).  Plaintiff argues that under New York's conflicts of law test, it is New York law which prevails.  (*Id.* at 5– 6).  However, Plaintiff agrees that "on the issue of online contract formation, 'New York, California, and Connecticut law are all similar' so '[c]ase law from other

16

jurisdictions may therefore provide useful guidance.'" (*Id.* at 6 (quoting *Wu v. Uber Techs., Inc.*, 43 N.Y.3d 288, 260 N.E.3d 1060, 234 N.Y.S.3d 111, 123–24 (2024)).

As Event Tickets notes in its Reply, Baugus "fails to cite any distinction between New York and Connecticut contract law that would alter the outcome of Event Tickets's motion." (Reply at 2 n.3). Nor has the Court found any.

Reliance merely on the Governing Law provision of the Terms & Conditions would be improper as it "would presume the applicability of a[n agreement] before its adoption by the parties has been established." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012). The question of an arbitration agreement's formation, like all contracts, is "governed by the choice-of-law doctrine of the forum state, here, New York." *Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 46 (E.D.N.Y. 2017). But "if the relevant states' laws do not conflict, a choice-of-law analysis is unnecessary and the court may apply the forum state's law." 19 Wright & Miller, Federal Practice and Procedure § 4506 (3d ed. 2016); *see also Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 613 N.E.2d 936, 597 N.Y.S.2d 904, 905 (1993) ("The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.").

Courts in the Second Circuit have repeatedly recognized that "traditional contract formation law does not vary meaningfully from state to state," and that precedents interpreting contract law principles under other states' laws may be relevant. *Edmundson*, 85 F.4th at 702–03; *see also Schnabel*, 697 F.3d at 119 (finding that it need not "resolve this typically thorny choice-of-law question,

17

because both Connecticut and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term"); *Meyer*, 868 F.3d at 74 (New York and California apply substantially similar contract formation rules); *McLean v. Lendbuzz Funding LLC*, No. 25 Civ. 2679 (JPO), 2026 WL 265668, at *3 (S.D.N.Y. Feb. 2, 2026) ("Second Circuit law indicates that contract formation principles under New York and Connecticut law bear substantial similarities."). Thus, Event Tickets is ultimately correct that "[b]ecause the laws in [New York and Connecticut] are substantially similar, the outcome of this motion would be the same under the laws of either jurisdiction." (Reply at 2 n.3).

Accordingly, the Court need not resolve the choice of law question, but can instead refer to general contract formation principles as recognized under both New York and Connecticut and applied in this Circuit.

### B. Contract Formation Principles in Internet Transactions

"'To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound.'" *Rensselaer Polytechnic Inst. v. Varian, Inc.*, 340 F. App'x 747, 749 (2d Cir. 2009) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)); *see also Lehrman v. Lovo, Inc.*, 790 F. Supp. 3d 348, 359 (S.D.N.Y. 2025). Similarly, "[t]o form a binding and enforceable contract in Connecticut, there must be an offer and acceptance based on a mutual understanding by the parties which is manifested by mutual assent between the parties." *Claude v. Wells Fargo Bank, N.A.*, No. 3:13-CV-535 (VLB), 2015 WL 5797007, at *7 (D. Conn. Sept. 30, 2015) (internal

quotations and citations omitted).  This framework applies to contracts formed online.  *See Register.com*, 356 F.3d at 403 ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.").[9]

It is worth briefly distinguishing the different formats of website contracts. As another court in this Circuit has helpfully summarized:

> Scrollwrap contracts—essentially always enforceable—require the electronic user to scroll through a full list of terms and conditions before accepting them.  Clickwrap contracts are similarly often enforceable, and "require[] users to click on an 'I agree' box after being presented with a list of terms and conditions of use."

> By contrast, browsewrap contracts—in which consumers are deemed to have accepted posted terms of an electronic service merely by continuing to use the service—are rarely enforceable unless the terms are conspicuously displayed on the electronic service. . . .

> [C]ourts have treated the middle ground between browsewrap and clickwrap contracts as "sign-in wrap agreements," which "do include a textual notice indicating the user will be bound by the terms, but . . . do not require the consumer to review those terms or to expressly manifest their assent to those terms by checking a box or clicking an 'I agree' button.  Instead, the consumer is purportedly bound by clicking some other button that they would otherwise need to click to continue with their transaction or their use of the website—most frequently, a button that allows the consumer to 'sign in.'"

---

[9] The question of whether Baugus and Event Tickets properly formed an agreement to arbitrate is one to be resolved by the court.  *See Perry St. Software, Inc. v. Jedi Techs., Inc.*, No. 20 Civ. 4539 (CM), 2020 WL 6064158, at *5 (S.D.N.Y. Oct. 14, 2020) ("[I]t is 'well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide.'" (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010))).  Although the Arbitration Provision here includes a delegation clause (*see* Terms at 9 (delegating to the arbitrator "any dispute over the validity, enforceability or scope of this arbitration provision")), Event Tickets correctly does not argue that the contract formation issue should be determined by the arbitrator.  That is in keeping with the rule that "parties may not delegate to the arbitrator the fundamental question of whether they formed an agreement to arbitrate in the first place."  *Alemayehu*, 934 F.3d at 251.

*Pilon v. Discovery Commc'ns, LLC*, 769 F. Supp. 3d 273, 288–89 (S.D.N.Y. 2025) (internal citations omitted).

Plaintiff correctly identifies the Website as a "sign-in wrap" design. (Pl. Br. at 32). The Delivery and Checkout Pages provide hyperlinks to Event Tickets's Terms & Conditions and intend to indicate that taking some action binds a user to those terms, but the user is not required to actually review those terms. (*See* Figures B, C). Defendant does not object to this characterization. *See also Hernandez*, 2026 WL 618252, at *3 (concluding that the Event Tickets "agreement is akin to a sign-in wrap agreement because the website provides a link to the Terms and Policies but does not require the user to review the terms").

The Second Circuit has found that "where there is no evidence that an internet or app user had actual knowledge of the contractual terms,[10] the user will still be bound if (1) a reasonably prudent person would be on *inquiry* notice of the terms, and (2) the user unambiguously manifests assent through . . . conduct that a reasonable person would understand to constitute assent." *Edmundson*, 85 F.4th at 703 (internal citations and quotations omitted) (emphasis in original); *see also Kern v. StubHub, Inc.*, No. 24 Civ. 871 (AT), 2024 WL 5283923, at *2 (S.D.N.Y. Dec. 17, 2024) ("Sign-in wrap agreements are enforceable contracts based on inquiry notice if (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a

---

[10] Here, no party argues that Baugus had actual notice of the relevant terms. Rather, both parties make arguments as to whether the Website meets the threshold for inquiry notice and whether Baugus manifested assent.

button or checking a box, that unambiguously manifests his or her assent to those terms." (internal quotations and citations omitted)); *Hines*, 380 F. App'x at 25 (noting that "in the context of agreements made over the internet, New York courts find that binding contracts are made when the user takes some action demonstrating that they have at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance").  Both inquiries are "generally measured by an objective standard, and are clearly . . . fact intensive." *Edmundson*, 85 F.4th at 703 (internal citations and quotations omitted).

"In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention," which "often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way." *Starke*, 913 F.3d at 289. For example, "when terms are linked in obscure sections of a webpage that users are unlikely to see, courts will refuse to find constructive notice." *Nicosia*, 834 F.3d at 233 (collecting cases).  However, when terms are presented on an "uncluttered" interface and are temporally and "spatially coupled with the mechanism for manifesting assent," the Second Circuit has approved of such designs as providing "reasonably conspicuous" notice. *Meyer*, 868 F.3d at 78–79.

The Second Circuit has outlined a number of instructive factors to guide this analysis, including "whether the terms of use are 'spatially coupled' with the checkout button, whether the entire screen is visible at once without scrolling, whether the checkout button is 'temporally coupled' with the hyperlink to the terms

21

of use, and whether the language is clear." *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 116 (2d Cir. 2025) (quoting *Starke*, 913 F.3d at 292).  Other courts have also considered related factors, such as the color and size of the relevant text and background, and other elements on the screen which clutter or obscure the textual notice.  *See, e.g.*, *Kern*, 2024 WL 5283923, at *3 (citing *In re Stubhub Refund Litig.*, No. 22-15879, 2023 WL 5092759, at *2 (9th Cir. Aug. 9, 2023)); *Smith v. RPA Energy, Inc.*, 732 F. Supp. 3d 278, 286–87 (S.D.N.Y. 2024).  The substance of the test is whether a "reasonably prudent offeree would be on inquiry notice of the term at issue." *Nicosia*, 834 F.3d at 236 (quotation omitted).

In addition, courts in this Circuit have sometimes considered "[t]he transactional context of the parties' dealings." *Meyer*, 868 F.3d at 80.  In particular, courts have found that a reasonable user was more likely on inquiry notice where a registration process or other aspect of the transaction "clearly contemplated some sort of continuing relationship between the putative user and [the interface operator], one that would require some terms and conditions." *Id.*; *see also Edmundson*, 85 F.4th at 707 (listing the fact that "there would be a continuing relationship involving the payment of installments over time" as one of multiple factors considered in evaluating inquiry notice); *Lojewski v. Grp. Solar USA, LLC*, No. 22 Civ. 10816 (PAE), 2023 WL 5301423, at *9 (S.D.N.Y. Aug. 17, 2023) ("[G]iven the 'transactional context of the parties' dealings,' any reasonable person in [plaintiff's] situation would presume that [the transaction] 'clearly contemplated

22

some sort of continuing relationship between the putative user and [defendant], one that would require some terms and conditions.'" (quoting *Meyer*, 868 F.3d at 80)).

### C.    Other Event Tickets Cases

Before evaluating the above factors as applied to the Website, the Court notes that, as the parties' post-briefing supplemental letters make clear, Event Tickets is, at least recently, no stranger to litigation involving its Website. Accordingly, the Court evaluates the extent to which the cases cited in the parties' supplemental briefs, *Gershzon v. Event Tickets Center, Inc.* and *Hernandez v. Event Tickets Center, Inc.*, bear on the dispute here.

#### 1.    *Gershzon*

In its supplemental letter, Event Tickets urges the Court to follow *Gershzon* and compel arbitration on the grounds that "*Gershzon* is virtually identical to this matter." (Dkt. No. 30 at 1). The plaintiff in *Gershzon*, like Baugus, purchased tickets through the same Website, filed a class action complaint against Defendant, and opposed Event Tickets's motion to compel arbitration on the basis of the Arbitration Provision. *Gershzon*, 2025 WL 2323355, at *1. And indeed, the court in *Gershzon* granted that motion. *Id.*

However, as Baugus correctly notes (Dkt. No. 31 at 1), the only contested issue in *Gershzon* was whether Event Tickets "waived its right to compel arbitration" by waiting nearly a year to file its motion to compel. 2025 WL 2323355, at *1–2. The plaintiff did not dispute that he had assented to the Arbitration Provision. *See Gershzon*, 2025 WL 2323355, at *2 ("Plaintiff does not oppose the

23

conclusion that ETC's checkout page provided reasonable notice of the terms of service, and that Plaintiff clicked a button unambiguously manifesting assent to those terms."). So although the *Gershzon* court granted the motion to compel arbitration, it did so without evaluating whether the Website provides inquiry notice or whether the plaintiff manifested assent to Event Tickets's terms. Accordingly, *Gershzon* is of limited value here, where Plaintiff does challenge whether the Website provides inquiry notice and whether he manifested assent.

### 2.    *Hernandez*

By contrast, the decision earlier this month in *Hernandez* is very much on point here.

*Hernandez*, too, involved plaintiffs who purchased tickets through Event Tickets's same Website and filed a class action complaint against Defendant (*Hernandez v. Event Tickets Center, Inc.*, No. 2:24-cv-1983-DAD-AC, Docket Numbers 1, 36, 45). Event Tickets moved to compel arbitration based on the Arbitration Provision, arguing that the Checkout Page provided reasonably conspicuous notice. *Hernandez*, 2026 WL 618252, at *1–2. The plaintiffs, like Baugus here, disagreed and argued in opposition that Event Tickets failed to demonstrate that they had reasonably conspicuous notice of those terms. *Id.* at *2. *Hernandez* proceeded to decide this issue, applying California law. *Id.* Under California law, "[w]hen analyzing whether notice was reasonably conspicuous, courts 'must look to both the context of the transaction and the placement of the

notice.'" *Id.* at *3 (quoting *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1019–20 (9th Cir. 2024)).

The court began its analysis by evaluating the context of the transaction at issue. *Id.* at *3–4. Like Baugus here, each of the plaintiffs in *Hernandez* purchased a concert ticket through the Website, although on only one occasion, and neither was required to download an app or sign up for an account to do so. *Id.* In evaluating this context, the court found that "a reasonable user likely would not consider this to be the kind of transaction that contemplated entering a forward-looking relationship governed by terms and conditions." *Id.* at *4. Accordingly, *Hernandez* concluded that "the context of plaintiffs' transaction supports a finding that plaintiffs were not on inquiry notice of the Terms and Policies." *Id.*

Next, *Hernandez* evaluated the visual design of the Checkout Page. Here, the court considered the font size and color of the text, the spatial proximity of the notice to the "PLACE ORDER" button, and other elements that might "clutter or obscure" the textual notice. *Id.* at *5–6. While finding that these factors varied as to whether they worked for or against Event Tickets, the court ultimately concluded that they "support a finding of reasonably conspicuous notice," but only "weakly" so. *Id.* at *6.

The court then weighed that finding—that "the placement of the notice" favored Event Tickets—together with its earlier finding that "the context of the transaction" favored plaintiffs. *Id.* The court concluded that, "when considering the context of the transaction [which did not suggest an ongoing relationship in which a

user may expect to be governed by terms and conditions] in conjunction with the weak visibility of the notice provision, the notice provision here does not sufficiently notify users of the Terms and Policies they purportedly agreed to." *Id.* at *7.  It reached this conclusion taking into account California law placing the "'onus . . . on website owners'" to put users on notice of their terms. *Id.* (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 289 Cal. Rptr. 3d 1, 25 (2021)).  Accordingly, *Hernandez* denied Event Tickets's motion to compel arbitration. *Id.*

Baugus brought *Hernandez* to the Court's attention the day after it was decided, noting that it involved "the exact same purchase flow and exact same delivery and payment pages at issue in this action" and that the court "held that the pages failed to provide reasonably conspicuous notice, 'considering [both] the context of the transaction in conjunction with the weak visibility of the notice provision." (Dkt. No. 33 (quoting *Hernandez*, 2026 WL 618252, at *7)).  Event Tickets contends that *Hernandez* was "wrongly decided,"[11] but also argues that its reasoning "does not apply here," primarily because it was decided under California law.  (Dkt. No. 34).

"[A]lthough 'the decisions of other district courts, including decisions from the same district, . . . are not binding on other district courts,' they may still be 'relevant and persuasive." *Apuzza v. NYU Langone Long Island*, No. 22 Civ. 7519 (NJC) (JMW), 2024 WL 3520544, at *5 n.2 (E.D.N.Y. July 23, 2024) (quoting *Sinkler v.*

---

[11] Consistent with this contention, Event Tickets has appealed *Hernandez* to the Ninth Circuit. *See Hernandez*, No. 2:24-cv-1983-DAD-AC, Docket Number 77.

*Berryhill*, 317 F. Supp. 3d 687, 690 (W.D.N.Y. 2018)).  As discussed below, the Court finds the *Hernandez* court's analysis highly instructive and persuasive, especially in its assessment of the design of the Website and its view that the Checkout Page overall supports a finding of reasonably conspicuous notice.  Guided by precedent in this Circuit, however, the Court parts company with *Hernandez* in its evaluation of the context of the transaction, as it pertains to the online purchase of event tickets, and in its evaluation as to the significance of this factor in the overall analysis.  As a result, the Court ultimately reaches a different conclusion from that in *Hernandez*.

### D.     Whether Baugus Was on Inquiry Notice

Event Tickets argues that inquiry notice was manifested in three ways: through the notice and hyperlink on the Checkout Page (Def. Br. at 8–14; Reply at 3–13), through the notice and hyperlink on the Delivery Page (Def. Br. at 14–16; Reply at 13–14), and through the presence of hyperlinks at the bottom of every page (Def. Br. at 1, 15; Reply at 2–3).  The parties, however, spend the bulk of their analysis on the Checkout Page.  (Def. Br. at 8–14; Pl. Br. at 15–35; Reply at 3–13).  And this was the only argument for inquiry notice considered in *Hernandez*.[12]

### 1.     Layout of the Checkout Page

The parties agree on the physical layout of the Checkout Page as depicted in Figure C, but disagree as to whether it provides reasonably conspicuous notice.

---

[12] Event Tickets does not appear to have argued in *Hernandez* that inquiry notice could be found based on the Delivery Page and the hyperlinks on every page.  *Hernandez v. Event Tickets Center, Inc.,* No. 2:24-CV-1983-DAD-AC, (E.D. Cal.), Docket Numbers 37, 41.

Plaintiff makes several arguments.  Overall, Baugus argues that the font size and color of the notice, particularly given the surrounding text and the "PLACE ORDER" button, obscure the relevant warning.  (Pl. Br. at 15–16).  Baugus first contends that the number of different font sizes and colors on the page creates substantial distraction, much like the website the Second Circuit found wanting in *Nicosia*, 834 F.3d at 233.  (Pl. Br. at 17–20).  With the various fonts, hyperlinks, timer, and other distractions, Baugus contends the clutter here precludes a finding of "reasonably conspicuous" notice.  (*Id.*).  Further, Baugus objects to the placement of the terms at the bottom of the page, where they are more likely to be missed after the user scrolls past the distractions above, particularly given that the notice is the smallest and faintest text on screen.  (*Id.* at 21–26).  Baugus takes particular objection with the size of the notice, arguing that Event Tickets intentionally obscures the provision with larger, more noticeable surrounding text, in contrast to other websites previously approved of within the Second Circuit.  (*Id.* at 27–32).

Event Tickets counters that the page fits well within permissible bounds. First, Defendant points to the one-column layout of the site creating a "natural flow," which guides customers directly to the relevant terms directly above the "PLACE ORDER" button.  (Def. Br. at 8–9).  To Event Tickets, the need to scroll weighs in its favor, as it reduces any potential clutter at the top of the page.  (Reply at 5–6).  Further, Event Tickets argues that the "terms & policies" phrase is prominently displayed in blue text, with similar sized text as the surrounding phrases, which draws the consumer's attention as contrasted with the surrounding

28

gray text.  (Def. Br. at 9; Reply at 4–5).  Moreover, Event Tickets points out that the terms are spatially and temporally coupled with the required mechanism for assent, the "PLACE ORDER" button, which leans in favor of upholding the layout.  (Def. Br. at 10; Reply at 3–4).  Finally, Defendant argues that its layout is devoid of the clutter disavowed in prior cases, as it contains fewer distractions and links than in those cases, and that its design is overall clean.  (Def. Br. at 11–15).  In particular, Defendant argues that features such as the timer, as well as the other objected-to features like the number of colors, do not invalidate the Website, as other courts have routinely approved of websites with such elements.  (Reply at 7–10).

At the outset, it is helpful to note that the court in *Hernandez* evaluated this same page and addressed almost all of the same arguments.  After review, this Court largely agrees with that court's analysis.

First, the Court discusses the size of the notice's text.  As Baugus highlights, the notice is smaller than the surrounding text and, as pointed out in *Hernandez*, "appears to be the smallest font size on the page, making it difficult to read."  2026 WL 618252, at \*5.  However, Baugus does not argue that the notice is illegible, and, like in *Hernandez*, the Court does not find it to be so, or to be so small as to not catch the eye.  *Id.*  Still, this factor weighs against conspicuousness.

Meanwhile, the color of the notice is light gray against a white background.  Courts, including *Hernandez*, have noted that this contrast decreases legibility in comparison to other color contrasts.  *Id.*; *see also In re Stubhub Refund Litig.*, 2023 WL 5092759, at \*2 (finding insufficient notice where "[t]he color of the relevant text

29

is gray and does not stand out against the white background; it is not obvious to the user that the text is hyperlinked; and the bright pink sign-up button obscures the muted colors of the relevant text providing notice"). Nevertheless, as Event Tickets points out (Def. Br. at 9; Reply at 5), it is not so objectionable as to doom the Website, and the fact that the "terms & policies" hyperlink "is a contrasting blue color . . . adds to the conspicuousness." *Hernandez*, 2026 WL 618252, at *5; *see also Meyer*, 868 F.3d at 78 ("Although the sentence is in a small font, the dark print contrasts with the bright white background, and the hyperlinks are in blue and underlined."); *Kern*, 2024 WL 5283923, at *3 (finding that "bright blue" hyperlink and "*dark* gray" notice stood out against lighter background (emphasis added)); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023) (finding sufficient notice where, *inter alia*, the notice hyperlink was conspicuously distinguished in bright blue font).

Moreover, Defendant is correct that the notice is spatially and temporally coupled with the "PLACE ORDER" button. (Def. Br. at 10; Reply at 3–4). The notice appears immediately above the button, with no intervening distractions that divert attention. This fact weighs in favor of finding reasonably conspicuous notice. *Edmundson*, 85 F.4th at 704; *Meyer*, 868 F.3d at 78–79; *Hernandez*, 2026 WL 618252, at *6 (proximity of notice to "PLACE ORDER" button "increases its conspicuousness"); *Graham v. Bloomberg L.P.*, No. 22 Civ. 7015 (VSB), 2023 WL 6037974, at *4 (S.D.N.Y. Sept. 15, 2023) ("The spatial and temporal connection

between the contract terms and the means for assenting to them weigh in favor of finding that [plaintiff] was on inquiry notice.").

Baugus suggests that this focus is too narrow. Rather than look merely to the hyperlink and checkout button, Baugus urges consideration of the page as a whole. Baugus argues that although the notice and checkout button may be spatially coupled with one another,[13] the box on the top right-hand side showing the event and the ticket price, the payment information fields that take up much of the page, and the information on the bottom of the page are spatially decoupled from one another. (Pl. Br. at 18–19). Accordingly, Baugus contends that the Website's layout is not intuitive and simple, but complicated, and this overall spatial decoupling cuts against inquiry notice. (*Id.*). The Court disagrees.

The notice and hyperlink are spatially coupled with "the 'button intended to manifest assent to the terms.'" *Edmundson*, 85 F.4th at 706 (quoting *Meyer*, 868 F.3d at 78). And that is what matters under this factor. The focus does not go to all of the important parts of the screen, but to the spatial coupling between the hyperlink to the terms and the button demonstrating a manifestation of assent. *See Starke*, 913 F.3d at 292 ("The text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appeared directly below, i.e., was 'spatially coupled' with the registration button." (quoting *Meyer*, 868 F.3d at 78)); *Domer v. Menard,*

---

[13] Plaintiff does not argue that the terms are not temporally coupled. Nor could he. The Website presents the consumer with the notice of terms at the same time it asks the consumer to place the order. *Cf. Starke*, 913 F.3d at 294 (notice of contract terms was "temporally decoupled" from transaction when consumer received such notice in a separate email sent after he completed his purchase on the website).

31

*Inc.*, 116 F.4th 686, 698 (7th Cir. 2024) (affirming district court's conclusion that notice and hyperlink were "spatially coupled" to "SUBMIT ORDER" button because they were "part of the natural visual flow of reviewing the page"); *Peni v. Daily Harvest, Inc.*, No. 22 Civ. 5443 (DLC), 2022 WL 16849451, at *4 (S.D.N.Y. Nov. 10, 2022) ("[T]he warning text, including the hyperlinks to the relevant terms, appears directly below the button used to register with Daily Harvest and is therefore spatially coupled with the button."). Here, the terms on the Checkout Page are clearly spatially coupled with the "PLACE ORDER" button. Accordingly, this factor weighs in favor of Defendant.

Next, the Court considers "whether other elements on the screen clutter or obscure the textual notice." *Hernandez*, 2026 WL 618252, at *6. The page need not be devoid of promotions, extraneous information, or other non-essential elements, but must "not include a plethora of clutter or extraneous information." *Edmundson*, 85 F.4th at 706; *see also Starke*, 913 F.3d at 293; *Nicosia*, 834 F.3d at 237–38, 241; *Feld*, 442 F. Supp. 3d at 830–32.

On this factor, Baugus complains of several elements. First, Baugus objects to the number of different font colors and sizes, alongside inconsistent bolding. (Pl. Br. at 17–18). Within this, Baugus specifically points to a plethora of blue text, some hyperlinked and some not, reducing the conspicuousness of the notice. (*Id.* at 18). Baugus also argues that the placement of the email address, credit card, and ticket insurance fields distracts from the notice, which is compounded by the consumer's need to scroll down the page. (*Id.* at 20–21). Baugus in substance

32

contends that the notice is effectively hidden based on its size and its placement immediately below other, larger notices. (*Id.* at 21–27).

Baugus's critique is overstated. As the *Hernandez* court assessed, and this Court agrees, the notice's conspicuousness is bolstered by the fact that it appears within the "natural flow of [the user's] actions because, after inputting their credit card information, and considering whether to purchase a ticket protection plan, users are required to scroll to the bottom of the page to click 'PLACE ORDER.'" *Hernandez*, 2026 WL 618252, at *6 (internal quotations omitted). While, as also noted by *Hernandez*, the placement of the ticket insurance information and separate one-line notices immediately above the relevant terms notice reduces the overall conspicuousness, *see id.*, the impact of this is modest. Meanwhile, the number of differing font sizes (four), colors (seven), and alternative hyperlinks (eight), while more cluttering than Baugus may like, is well below the "between fifteen and twenty-five links" criticized in *Nicosia* (834 F.3d at 237), and fits comfortably within the ranges approved of by other courts, often without discussion. *See, e.g.*, *Berlinger*, 2026 WL 203538, at *3–6; *Hong*, 2024 WL 4720924, at *5–7; *Karim v. Best Buy Co.*, No. 22-CV-4909-JST, 2023 WL 3801909, at *3–5 (N.D. Cal. June 2, 2023); *Maldonado v. Nat'l Football League*, No. 22 Civ. 2289 (ALC), 2023 WL 4580417, at *3 (S.D.N.Y. July 18, 2023).

As Event Tickets contends (Def. Br. at 11–12; Reply at 11–13), its Checkout Page resembles the Grubhub checkout page found sufficient by the Second Circuit in *Davitashvili*, 131 F.4th at 115–17. As here, the Grubhub checkout page included

33

a plethora of other information and fields, including a summary of the order and the price, delivery instructions, payment information, and options to tip the driver and donate change.  (*See* Def. Br. at 12, Figure 4 (image of Grubhub checkout page)).  The Second Circuit found the page "less cluttered than the webpage in *Nicosia*" and held that its "features, taken together, are enough to provide inquiry notice to a reasonably prudent web user."  *Davitashvili*, 131 F.4th at 116–17.  The Court does not necessarily agree with Event Tickets that its Checkout Page is "even more streamlined" and more conspicuous than Grubhub's (Def. Br. at 12; Reply at 12); among other things, the relevant notice there was more visible to the naked eye than is the case here.  But overall, the ruling in *Davitashvili* supports a finding of conspicuousness here.[14]

That the user must scroll down to reach the terms does not cut against a finding of conspicuousness.  To be sure, the Second Circuit in *Meyer* noted that the fact that the "entire screen is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice," weighed in favor of conspicuousness.  868 F.3d at 78.  And the court similarly noted in *Edmundson* that it was more likely to find inquiry notice where "the user does not need to scroll

---

[14] Plaintiff argues that the *Davitashvili* court's discussion of inquiry notice was "dicta" because it affirmed the district court on other grounds.  (Pl. Br. at 29).  This is incorrect.  Before affirming the denial of the motion to compel, the Second Circuit reversed the district court's finding that Grubhub had failed to put users on inquiry notice.  *Compare Davitashvili*, 131 F.4th at 115–17 *with Davitashvili v. Grubhub Inc.*, No. 20 Civ. 3000 (LAK), 2023 WL 2537777, at *8–9 (S.D.N.Y. Mar. 16, 2023).  Only after the Second Circuit did so, and thus found an agreement to arbitrate, did it affirm the district court's rulings that Grubhub's terms left the arbitrability issue to the court and that plaintiffs' antitrust claims did not fall within the scope of the arbitration clause.  Because finding an agreement to arbitrate necessarily precedes discussion as to the meaning and scope of that agreement, the Second Circuit's discussion of inquiry notice is a holding, not dicta.  *See Davitashvili*, 131 F.4th at 115 ("We hold, first, that Plaintiffs agreed to arbitrate with Defendants.").

beyond what is immediately visible to find the terms." 85 F.4th at 704. Meanwhile, the same court criticized the requirement to scroll where "there is no reason to assume that viewers will scroll down to subsequent screens simply because screens are there." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002). But this does not mean that the need to scroll automatically works against a finding of reasonably conspicuous notice.

Rather, the purpose of the inquiry is to assess whether the terms are "buried at the bottom of a webpage or tucked away in obscure corners of the website where users are unlikely to see it." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 402 (E.D.N.Y. 2015); *see also Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (finding insufficient notice of terms where plaintiff "could not even see the link to them without scrolling down to the bottom of the screen—an action that was not required to effectuate her purchase"), *aff'd*, 380 F. App'x 22 (2d Cir. 2010); *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220–21 (9th Cir. 2019). Courts have found that scrolling itself is no barrier to a finding of conspicuous notice where the user is also required to scroll to the same place to complete the purchase. *See, e.g., Hidalgo v. Amateur Athletic Union of U.S., Inc.*, 468 F. Supp. 3d 646, 657 (S.D.N.Y. 2020) ("An applicant . . . would be unable to avoid the part of the application containing the hyperlinks leading to the [terms] because the applicant would necessarily proceed through the application in linear fashion and could not complete the application without having reviewed that page."); *Snow v. Eventbrite, Inc.*, No. 3:20-CV-3698-WHO, 2020 WL 6135990, at *7 (N.D. Cal. Oct. 19, 2020) (sign-in wrap

agreement sufficient to put user on notice where notice message "is directly above that Pay Now button, meaning that [the user] had to scroll past it to press the button"). That is the case here. A user must scroll to the purchase button to complete their transaction, and in doing so, necessarily will scroll past the terms. And as Event Tickets points out, much of the clutter is no longer visible at that point: the user's eye is then focused on the spatially coupled notice and "PLACE ORDER" button. (Reply at 5–6). Accordingly, the requirement to scroll does not cut against, and if anything cuts in favor of, conspicuousness in this case.

Finally, Baugus contends that the countdown timer undermines the consumer's ability to take the time to notice the hyperlink, let alone click on it and read and digest the Terms & Conditions. (Pl. Br. at 32–35). As Event Tickets points out (Def. Br. at 14; Reply at 7), however, several courts have upheld designs with 10-minute countdown timers, like the one present here. *See, e.g.*, *Kern*, 2024 WL 5283923, at *2–3; *Hong*, 2024 WL 4720924, at *1, 5–7.

While the Court agrees with Baugus that the countdown timer is relevant to the analysis, and cuts against conspicuousness (*see* Pl. Br. at 32), it does not affect a reasonable user's interaction with the Website so substantially as to preclude a finding of notice. *See Hong*, 2024 WL 4720924, at *7 (acknowledging that "the user may face time pressure" as a result of a timer, but concluding that hyperlinked notice appearing directly above "Buy Now" button "was adequately conspicuous to provide Plaintiff" with inquiry notice). The court in *Berlinger* recently rejected a similar argument made by a plaintiff in quite similar circumstances, involving a

36

ticket website, a 10-minute countdown timer, and an agreement of equivalent length to Event Tickets's Terms and Conditions.  The court was "unpersuaded that [defendant's] countdown clocks rendered access or review of the relevant terms too difficult" given its placement "on the upper right-hand corner of the checkout screen and on the webpage tab—visually separated from the 'Buy Now' button and the 'terms and conditions' hyperlink."  *Berlinger*, 2026 WL 203538, at *5–6.  That mirrors the layout here.

Based on a holistic review of the relevant factors, the Court agrees with *Hernandez* that the Checkout Page itself constitutes reasonably conspicuous notice.  2026 WL 618252, at *6 ("The factors used to analyze the placement of the notice and the visual design of the [W]ebsite weakly support a finding of reasonably conspicuous notice.").  This conclusion is reinforced by the holdings of other courts in this District finding that similarly designed websites for online ticket vendors— where the notice to the contractual terms appeared with a blue hyperlink directly adjacent to the order button, and with language indicating that by clicking the button the consumer was agreeing to the terms—were sufficient to put a reasonably prudent user on inquiry notice.  *See Berlinger*, 2026 WL 203538, at *6; *Kern*, 2024 WL 5283923, at *3; *see also Vasell v. SeatGeek, Inc.*, No. 24 Civ. 932 (NCM) (JRC), 2025 WL 240912, at *6 (E.D.N.Y. Jan. 17, 2025) (finding similar checkout page sufficient although noting that plaintiffs did not dispute inquiry notice).

### 2.    Context of the Transaction

As noted above, the *Hernandez* court, despite finding that the design and layout of the Website supported a finding of inquiry notice, nevertheless found that the context of the transaction compelled the conclusion that the notice provision was insufficient.  *Hernandez*, 2026 WL 618252, at *7.  That was based on its assessment that the transaction was a "one-time" or "one-and-done interaction" that did not "contemplate[] entering a forward-looking relationship governed by terms and conditions."  *Id.* at *3–4.  This Court does not adopt that conclusion here, for several reasons.

First, the *Hernandez* court was applying California law, *id.* at *2, and California law places greater weight on the context of the transaction than is the case in decisions in this Circuit applying New York or Connecticut law or principles of online contract formation in general.  California law "*requires* courts to '*first* evaluate the full context of the transaction,' and consider whether 'that type of transaction contemplates entering into a continuing, forward-looking relationship' governed by terms and conditions.'"  *Keebaugh*, 100 F.4th at 1017 (quoting *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 292 Cal. Rptr. 3d 47, 64 (2022)) (emphasis added); *see also Sellers*, 289 Cal. Rptr. 3d at 26 (describing the "full context of the transaction" as "*critical* to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms") (emphasis added).  While the context of the transaction "is a non-dispositive factor under California law," *Keebaugh*, 100 F.4th at 1019, California state and federal courts

have demanded a higher level of conspicuousness when the user has engaged in a one-time or one-off transaction and declined to enforce online agreements to arbitrate in such circumstances. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 856, 866–67 (9th Cir. 2022) (Baker, J. concurring) (under California law, "websites inviting one-off-transactions will be held to higher standards than those proposing continuing associations").

Significantly, the California Court of Appeal in *Sellers*, in fashioning California's context-of-the-transaction test,[15] sharply criticized federal court rulings that had taken a more permissive approach to inquiry notice, particularly in the context of sign-in wrap agreements. *See Sellers*, 289 Cal. Rptr. 3d at 21–22 (stating that, "in our view, the federal courts have trended towards finding *any* textual notice sufficient to bind a consumer, while also applying largely subjective criteria that, at times, results in inconsistent conclusions" (emphasis in original)). In particular, the *Sellers* court disagreed with the views taken by the federal courts about the "typical online consumer," which it described as "[c]ontrary to the analysis" in California decisions. *Id.* at 24. While federal decisions presumed that online commerce had become so commonplace that "'[a]ny reasonably-active adult

---

[15] Event Tickets contends that the context of the transaction test is not a general feature of California law, but simply "reflects the specific purpose of California's Automatic Renewal Law ('ARL')." (Def. No. 34 at 2 (citing *Sellers*, 289 Cal. Rptr. 3d at 26)). Event Tickets is mistaken. While *Sellers* was decided in the context of an ARL claim, the Ninth Circuit in *Keebaugh* applied its principles, which were then applied by the *Hernandez* court, in a case that did not involve a claim under the ARL. *See Keebaugh*, 100 F.4th at 1019 (noting that "Plaintiffs have not brought a claim under the ARL"); *see also Cody v. Jill Acquisition LLC*, 802 F. Supp. 3d 1261, 1275 (S.D. Cal. 2025) ("Defendant first contends that *Sellers* was decided in—and consequently is limited to—the context of California's [ARL.] . . . The California Court of Appeal's recent decision in *Cruz* [*v. Tapestry, Inc.*, 113 Cal. App. 5th 943 (2025)], however . . . proves that Defendant reads *Sellers* far too narrowly.").

consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider,'" *id.* (quoting *Selden v. Airbnb, Inc.*, No. 16-cv-933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016)), *Sellers* emphasized that "not all internet users are alike" and many "have only recently, and perhaps begrudgingly, begun to use cell phones, or other internet-enabled devices, for the purpose of online commerce."  *Id.* at 25.[16]

These considerations led the court to conclude, as a matter of policy, that "it is more appropriate to focus on the providers, which have complete control over the design of their websites and can choose from myriad ways of presenting contractual terms to consumers online."  *Id.*  Providers, the court noted, can "eliminate any uncertainty" by using clickwrap and scrollwrap agreements instead of sign-in wrap agreements.  *Id.*  In California, the court held, "'the *onus must be on website owners* to put users on notice of the terms to which they wish to bind consumers.'"  *Id.* (quoting *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 200 Cal. Rptr. 3d 117, 127 (2016)) (emphasis added).

---

[16] Among the federal decisions that *Sellers* expressed disagreement with were cases in this Circuit that "have refused to 'presume that the user has never before encountered an app or entered into a contract using a smartphone.'"  *Id.* (quoting *Meyer*, 868 F.3d at 77, and also citing *Feld*, 442 F. Supp. 3d at 830).  Second Circuit precedent has squarely embraced the view of online consumers expressed in *Selden*, rather than the view expressed in *Sellers*.  *See, e.g.*, *Edmundson*, 85 F.4th at 704 (noting that the reasonably prudent user standard "does not require us to imagine a user who has 'never before encountered' a smartphone app or entered into an online contract" and citing *Selden* with approval (quoting *Meyer*, 868 F.3d at 77)); *see also Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 278 (E.D.N.Y. 2019) ("[I]s there any question that reasonably prudent internet users know that there are terms and conditions attached when they log onto Facebook, order merchandise on Amazon, or hail a ride on Uber?  They know this, not because a loud, brightly-colored notice on the screen tells them so, but because it would be difficult to exist in our technological society without some generalized awareness of the fact."), *aff'd*, 815 F. App'x 612 (2d Cir. 2020).

This was the framework applied in *Hernandez*: the court began its analysis by separately evaluating the context of the transaction, *see* 2026 WL 618252, at *3, and ultimately concluded that the Event Tickets Website did not pass muster in light of the "[i]mportant[]" principle of California law that "'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.'" *Id.* at *7 (quoting *Sellers*, 289 Cal. Rptr. 3d at 25).

This framework for analyzing the context of an online transaction is not shared by courts in the Second Circuit, or those in New York or Connecticut. It is true, as noted above, that the Second Circuit has recognized that the "transactional context" can be relevant to inquiry notice and can, where it suggests a "continuing relationship . . . over time," be a factor supporting a finding of inquiry notice. *See Edmundson*, 85 F.4th at 707 (applying Connecticut law); *Meyer*, 868 F.3d at 80. But courts in the Second Circuit are not required to consider the context of the transaction when analyzing inquiry notice, let alone as a separate and independent factor. Nor has the Second Circuit, or courts in New York or Connecticut, adopted a rule placing the "onus" on ecommerce vendors to remove doubts about whether the consumer is on notice.

Moreover, the Court is unaware of any decision in the Second Circuit, New York, or Connecticut holding that an otherwise reasonably conspicuous notice can be deemed insufficient based on the context of the transaction. Notably, the courts in this Circuit that have found online ticket websites to provide sufficient notice have reached that conclusion without discussing the context of the transaction. *See*

*Berlinger*, 2026 WL 203538, at *5–6; *Kern*, 2024 WL 5283923, at *3; *Vasell*, 2025 WL 240912, at *6.  The same is true of other cases involving one-time purchases that did not contemplate a continuing relationship.  For example, *Maldonado* involved the purchase of licensed sports products, such as jerseys, from the websites of the NFL and its partner Fanatics, Inc.—a quintessentially "one-time" transaction.  There, the court upheld the websites (which shared many similarities with the Event Tickets Website) as providing reasonably conspicuous notice based solely on the websites' designs, without discussing the context factor.  2023 WL 4580417, at *2–3; *see Maldonado v. Nat'l Football League*, No. 22 Civ. 2289 (ALC), Docket Number 42-1 Ex. 3 at 3, Ex. 4 at 3.

In sum, under California law, the context factor can be, as it was in *Hernandez*, a heavy thumb on the scale in favor of the online user in a manner not authorized under the applicable law in this case.  In the absence of authority from the Second Circuit or the New York or Connecticut courts endorsing such an approach, this Court does not believe it is appropriate to rely on the context factor to undo its finding that, based on the Checkout Page's design and layout, it provides sufficient inquiry notice to a reasonably prudent user.

Second, to the extent that the context of the transaction is a relevant factor here, the Court finds that it does not weigh against a finding of reasonably conspicuous notice.  The purpose of examining context is to determine if a reasonable consumer would expect there to be terms and conditions associated with the transaction.  *See Lojewski*, 2023 WL 5301423, at *9 (assessing whether "any

42

reasonable person in [plaintiff's] situation would presume that this third step of the process 'clearly contemplated some sort of continuing relationship between the putative user and [defendant], *one that would require some terms and conditions*'" (quoting *Meyer*, 868 F.3d at 80)) (emphasis added).  Such an expectation can exist even when the purchase does not "require[] a registration process" or "require[] [users] to download an app."  *Hernandez*, 2026 WL 618252, at *4.  A broader view of the transaction's context is required, encompassing, *inter alia*, the nature of the product purchased.  *See Arif v. Wells Fargo Bank, N.A.*, No. 4:24-CV-4044-LLP, 2025 WL 949551, at *9 (D. S.D. Mar. 28, 2025) ("In evaluating the context of the transaction, the Court considers details such as the duration of the relationship the transaction aims to establish and *nature of the goods or services being transacted*." (emphasis added)).

A reasonably prudent consumer purchasing tickets to an entertainment or sporting event on an online ticket platform should expect the vendor to have some terms and conditions.  *See Linders v. Festival Fun Parks, LLC*, No. 3:25-CV-659 (SVN), 2026 WL 636669, at *9 (D. Conn. Mar. 6, 2026) ("Defendant argues no reasonable consumer would expect that they could purchase tickets online with no applicable terms and conditions.  True enough[.]") (internal quotations omitted).  Even before the Internet, it was common knowledge that tickets to entertainment events carried terms and conditions, which the purchaser acceded to by buying the tickets and attending the event.  *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1451 (7th Cir. 1996) ("[C]onsider . . . a ticket to a concert.  The back of the ticket states

43

that the patron promises not to record the concert; to attend is to agree."); *Druyan v. Jagger*, 508 F. Supp. 2d 228, 237 (S.D.N.Y. 2007) (enforcing contract term on back of concert ticket after the Rolling Stones cancelled and noting it is "well-established that the terms of the plaintiff's ticket constitute an enforceable contract"); Joe Nocera, *Danger at the Ballpark, and in Baseball Ticket's Fine Print*, N.Y. TIMES, (Nov. 20, 2015), https://www.nytimes.com/2015/11/21/sports/baseball/danger-at-the-ballpark-and-in-a-baseball-tickets-fine-print.html (noting long history of major league baseball teams "avoid[ing] liability for fan injuries by inserting some legalistic fine print on the back of the ticket").[17]  Just as in those days a consumer was "expected to turn over a ticket to learn of its terms," so the consumer in the Internet age is expected to "click on a hyperlink to view the Terms and Conditions of Service." *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 454 (E.D.N.Y. 2013) (Bianco, J.) (agreeing with the analogy drawn by Judge Holwell in *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839–41 (S.D.N.Y. 2012), that "at least for those to whom the internet is [ ] an indispensable part of daily life, clicking the hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket").

Terms and conditions are expected because the parties' rights and obligations do not end with the purchase of the tickets.  The tickets are purchased to be used at a specific event to take place in the future—here, concerts.  Many things can happen before, or at, the concert that can have legal consequences.  As a result,

---

[17] For examples of baseball game tickets of yore (*i.e.*, from the twentieth-century), *see* TICKETS FROM THE PAST, https://ticketsfromthepast.com/shop/ (last visited Mar. 29, 2026).

there is a corresponding need to anticipate such contingencies and define the parties' rights and obligations ahead of time in a binding contract.  *See, e.g.*, Jeremy M. Evans & Justin M. Jacobson, *Oh No! They Rescheduled the Harry Styles Concert! Force Majeure and "Rain and Shine" Language in a Time of Disasters and Pandemics*, 39 GPSolo 44, 45 (March/April 2022) (available on Westlaw) (noting that "[i]t is common" for "live sporting events, musical concerts, festivals, and other 'ticketed' ventures[] to include standard 'terms and conditions'").

Event Tickets's own Terms & Conditions demonstrate this fact.  They include provisions as to what will happen if, *inter alia*, the event is postponed, rescheduled, or cancelled (Terms at 2), tickets are no longer available at the price or in the quantity originally ordered (*id.*), there is a change in the event venue, start time, or performer list (*id.* at 5), the user is removed from the venue based on unacceptable behavior (*id.*), there are delays in the shipment of tickets or verification of the delivery address (*id.* at 5–6), the user is unable to pick up tickets from a designated location due to failure to bring proper identification (*id.* at 6–7), the user is denied entry by the venue (*id.* at 7), or the third party ticket seller provides untruthful information or has no ability to sell the tickets (*id.* at 9).  These terms are indicative of what Baugus, or any reasonable purchaser, would likely know: that his relationship with Event Tickets was not necessarily over after he clicked the "PLACE ORDER" button or, indeed, after the tickets were delivered to him.[18]

---

[18] Event Tickets argues that this case demonstrates an "ongoing relationship" because Baugus purchased tickets on the Website on more than one occasion.  (Dkt. No. 34 at 2).  This argument is unpersuasive.  Event Tickets points to no case law supporting the notion that two independent purchases would constitute an ongoing relationship, nor has this Court found any.  And this makes

The situation here thus differs markedly from those involving "one-time" online transactions that the California courts have found to undermine reasonable notice, such as a consumer buying "a single pair of socks," *see Sellers*, 289 Cal. Rptr. 3d at 25, a bouquet of flowers, *see Long*, 200 Cal. Rptr. 3d at 126, or a $49.99 poncho from an online apparel store, *see Cody v. Jill Acquisition LLC*, 789 F. Supp. 3d 940, 960 (S.D. Cal. 2025).  In those circumstances, where the transaction is truly "one and done," "most consumers would not expect to be bound by contractual terms," *see Sellers*, 289 Cal. Rptr. 3d at 16.  But that is not the case here: a reasonable internet user, when purchasing an event ticket, likely does expect "some continuing relationship" governed by "some terms and conditions."  *Meyer*, 868 F.3d at 80.  Accordingly, a "context of the transaction" analysis does not undermine, and if anything reinforces, the conclusion that Event Tickets's Checkout Page appropriately puts a reasonably prudent user on inquiry notice.

Finally, although sharing the *Hernandez* court's concerns over certain features of the Checkout Page, this Court does not view the sufficiency of its design as quite as close a call as the *Hernandez* court believed, at least in light of this Circuit's precedent.  Coupled with its differing assessment of the context of the

---

sense.  The notion that a consumer enters into a continuing relationship merely through multiple purchases at distinct times stretches the definition of "continuing relationship" too far.  *See Nixon v. Vegas.com, LLC*, No. 25-cv-5688-CRB, 2025 WL 3719885, at *5 (N.D. Cal. Dec. 23, 2025) ("[Plaintiff's] *past* visits to the website [without purchase] before making his transaction does not change the fact that his relationship with [defendant] 'did not contemplate any *future* purchases that would be bound by terms.'" (quoting *Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 765–66 (N.D. Cal. 2025)) (emphasis in original).  One does not expect to have a continuing relationship with a flower shop after buying a bouquet from it on Monday and again on Friday.  Moreover, even if this could be demonstrated by some number of repeated purchases, the number would be greater than two.

transaction, the Court thus respectfully declines to adopt the *Hernandez* court's

conclusion that the onus was on Events Tickets to create a Website that more

clearly put users on notice of its Terms & Conditions.  *See Edmundson*, 85 F.4th at

707 (concluding that, while the interface in question "has some deficiencies," none of

them "are fatal," and emphasizing that "there are no particular features that must

be present to satisfy the reasonably conspicuous standard" and "there are infinite

ways to design a website" (citations omitted)).

For the foregoing reasons, the Court holds that the Checkout Page provided

Baugus with reasonably conspicuous notice of the Terms & Conditions and, thus,

placed him on inquiry notice.[19]

---

[19] Because the Court has concluded that the Checkout Page was sufficient to put Baugus on inquiry notice, it need not reach Events Tickets's additional arguments that notice is established by (1) the Delivery Page or (2) the hyperlinks at the bottom of each Website page.  For the sake of completeness, however, the Court will briefly address these arguments, as each is insubstantial.

First, Event Tickets contends that Baugus was given notice of its contract terms, and manifested his assent to those terms, when he entered his email address as requested on the Delivery Page, unchecked the box below next to the phrase "Yes, I want EventTicketsCenter.com to send me event updates and ticket discounts.  Privacy Policy.," and then clicked the "PROCEED TO PAYMENT" button.  (Def. Br. at 14–16; Reply at 13–14; *see* Figure B).  But "a consumer's clicking on a [ ] button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the [ ] button would signify assent to those terms."  *Specht*, 306 F.3d at 29–30.  Here, the language on the Delivery Page plainly is insufficient to signal to a reasonable user that they would be agreeing to any terms by inputting their email, checking (or unchecking) the box, or clicking the button to proceed.  The "mere reference" to a hyperlink is insufficient.  *Rodriguez v. Festival Fun Parks, LLC*, 763 F. Supp. 3d 336, 355 (E.D.N.Y. 2025); *see also Arnaud v. Doctor's Assocs. Inc.*, 821 F. App'x 54, 56–57 (2d Cir. 2020) (agreeing with district court finding that there was no inquiry notice where, *inter alia*, the relevant website "did not provide language informing the user that by clicking 'I'M IN' the user was agreeing to anything other than the receipt of a coupon"); *Starke*, 913 F.3d at 293 (finding insufficient notice where the email containing the hyperlinked terms "in no way signal[ed] to [plaintiff] that he should click on the link, and it [did] not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking that link").

Second, Event Tickets's reliance on hyperlinks to the Terms & Conditions that appeared at the bottom of every Website page (Def. Br. at 1, 15; Reply at 2–3) is no more availing.  "[W]here a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on— without more—is insufficient to give rise to constructive notice."  *Nguyen*, 763 F.3d at 1178–79; *see*

47

E.    **Whether Baugus Manifested Assent**

Having found that the Checkout Page provides reasonably conspicuous notice of the relevant terms, the Court next addresses whether Baugus manifested assent to those terms by clicking the "PLACE ORDER" button to compel arbitration.  The Court finds that he did so.

A "manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *Starke*, 913 F.3d at 289.  Although manifestation of assent need not be "express," it must be "unambiguous in light of the objectively reasonably notice of the terms."  *Meyer*, 868 F.3d at 79.  For web-based contracts, "'an electronic "click" can suffice to signify the acceptance of a contract.'"  *Id.* at 75 (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016)).

There is no doubt that the final notice on the Checkout Page ("By clicking 'Place Order,' you are agreeing to EventTicketsCenter.com's terms & policies.  All sales are final."), considered in isolation, would suffice to establish unambiguous manifest assent.  *See, e.g.*, *Meyer*, 868 F.3d at 79 (finding that "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY" was a "clear prompt directing users to read the [Terms] and signaling that their acceptance of the benefit of registration would be subject to contractual terms"); *Maynez v.*

---

*also Linders*, 2026 WL 636669, at *10 ("[R]epeated presentations of Terms that are neither sufficiently conspicuous, nor sufficiently integrated with the rest of the purchase process, are no more persuasive or sufficient to provide notice than one presentation."); *Herman v. Seaworld Parks & Ent., Inc.*, No. 8:14-CV-3028-T-35JSS, 2016 WL 7447555, at *6 (M.D. Fla. Aug. 16, 2016) ("[The] location of the hyperlink alone [on the bottom of every page] is insufficient to place reasonably prudent website users on inquiry notice of the Website Terms and Conditions.").

*Walmart, Inc.*, 479 F. Supp. 3d 890, 896–98 (C.D. Cal. 2020) (plaintiff assented to terms where disclaimer warned that "[b]y clicking Place Order, you agree to Walmart's Updated Privacy Policy and Terms of Use").  However, Baugus argues that the provision cannot be considered in isolation.  Rather, he contends that by coupling that notice with the one directly above it (stating "[b]y clicking 'Place Order,' your credit card will be charged $XX USD, which includes ticket, service and delivery fees"), the Checkout Page "provides two different explanations for what clicking the 'PLACE ORDER' button means," which "creates an ambiguity over what exactly the consumer is agreeing to."  (Pl. Br. at 35).

Baugus compares this design to the one struck down in *Herzog v. Super. Ct.*, 101 Cal. App. 5th 1280, 321 Cal. Rptr. 3d 93 (2024), where the court found that the user had not unambiguously assented to the relevant terms because of the block notice preceding a required checkbox stating "I agree to Terms of Use."  The block included, *inter alia*, an agreement to have one's "personal information . . . collected, used and shared consistently with the . . . Terms of Use" and their personal information "stored and processed by Dexcom, Inc. and/or its affiliate[.]"  *Id.* at 113–14.  The court found that the block quote created ambiguity as to whether the user was assenting to the narrower agreement of having "their personal information collected, used and shared 'consistently with' the Terms of Use," or to the broader agreement of all the terms in the hyperlink next to the checkbox, which included an arbitration clause.  *Id.* at 101, 114.  Accordingly, *Herzog* found that a user could not unambiguously manifest assent, and declined to compel arbitration.  *Id.* at 114.

Baugus contends the same is true of the Checkout Page.  He argues that "a consumer could reasonably understand that the hyperlinked 'terms & policies' narrowly refers to the finality of sales and the enumerated credit card charges" or, alternatively, the full set of terms and arbitration clause.  (Pl. Br. at 37).  Baugus is incorrect.

Both notices on the Checkout Page contain the same dependent clause, "[b]y clicking 'Place Order.'"  (*See* Figure D).  It is therefore easy to imagine the two notices joined in the same sentence ("By clicking 'Place Order," your credit card will be charged $XX USD, which includes ticket, service and delivery fees, and you are agreeing to EventTicketsCenter.com's terms & policies.  All sales are final.").  There is little doubt that such a notice would be sufficient, as there is nothing which prevents a user from agreeing to multiple sets of terms through one manifestation of assent.  *See Meyer*, 868 F.3d at 79 (finding that "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY" was a "clear prompt directing users to read the [Terms] and signaling that their acceptance of the benefit of registration would be subject to contractual terms"); *Peni*, 2022 WL 16849451, at *4–5 (holding that the language of the warning—"[b]y clicking above, you agree to our Terms of Use and Terms of Sale, and consent to our Privacy Policy"—was "a clear prompt directing users to review the Terms of Use, Terms of Sale, and Privacy Policy" and concluding that the plaintiff "manifested assent to the Terms of Use by clicking the registration button and creating an account"); *Graham*, 2023 WL 6037974, at *5 (finding that the warning language—"[b]y submitting my

information, I agree to the Privacy Policy and Terms of Service and to receive offers and promotions from [defendant]" — was "a clear prompt to read the terms and conditions and signal[ed] to a user that purchase will bind them to those terms").

This highlights the real deficiency troubling the *Herzog* court: that the additional notice also referred to the relevant terms in a manner inconsistent with the primary notice. Event Tickets's notices do not suffer from this deficiency. And the decision to split them does not make Baugus's consent ambiguous. Rather, the structure proves more similar to that approved of in *Singh v. Adobe Inc.*, 797 F. Supp. 3d 1038 (N.D. Cal. 2025).

> In *Singh*, the relevant website included a notice stating that
>
> By clicking "Agree and subscribe," you agree: After your free trial ends on [Date], you will be charged US $29.99 (plus tax) monthly. At the end of your one-year term, your subscription will automatically renew monthly until you cancel. No annual commitment required after the first year. Price subject to change at renewal. Cancel before the free trial ends and you won't be charged. Cancel before [Date] to get a full refund and avoid a fee. Cancel anytime via Adobe Account or Customer Support. You also agree to the Terms of Use and the Subscription and Cancellation Terms.

797 F. Supp. 3d at 1048.

The court in *Singh* upheld this notice without hesitation, finding that "[b]y clicking 'Agree and subscribe,' . . . [y]ou also agree to the Terms of Use and the Subscription and Cancellation Terms" was "precisely the type of language" sufficient to unambiguously manifest assent. *Id.* at 1050.

Event Tickets's notice is even clearer than the notice approved of in *Singh*. Unlike in *Singh*, where the preceding text discussed at length terms related to the

start and end of a trial, automatic renewal, price changes, cancellation, and other terms before also mentioning the relevant terms, Event Tickets's notice refers only to the charging of a final price.  (*See* Figure D).  Further, Event Tickets's text gives greater warning by structuring both sentences with an identical dependent clause, unlike the structure in *Singh*.  Such a structure does not create ambiguity.  *See also Meyer*, 868 F.3d at 80 ("The fact that clicking the register button had two functions—creation of a user account and assent to the Terms of Service—does not render Meyer's assent ambiguous.").

It follows that, by clicking the "PLACE ORDER" button, Baugus unambiguously manifested his assent to the terms hyperlinked on the Checkout Page.

### F.    Scope of the Arbitration Provision

"Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to show the agreement to be inapplicable or invalid."  *Zachman*, 49 F.4th at 102 (internal quotation omitted).

As noted above, Baugus does not contest that his claims are covered by the Arbitration Provision.  Nor does he mount any challenge on this motion (save for his contract formation challenge) to the validity or enforceability of the Arbitration Provision, or for that matter, to the Terms & Conditions as a whole.[20]  Accordingly, the Arbitration Provision must be enforced.

---

[20] As noted, the Arbitration Provision includes a delegation clause, requiring that disputes regarding the "validity, enforceability or scope of" the provision be decided in arbitration.  (Terms at 9).  As a consequence, even if Baugus did challenge the validity of the Arbitration Provision or the Terms & Conditions, that challenge would have to be decided by the arbitrator, unless Baugus were also

## CONCLUSION

For the reasons set forth above, Defendant's motion to compel arbitration is

**GRANTED**.  This case is hereby **STAYED** pending the arbitration.[21]  The parties

shall provide a joint status update concerning the progress of the arbitration on

June 30, 2026 and every three months thereafter until the arbitration is resolved.

The parties shall also promptly notify the Court when the arbitration is concluded

or the parties have reached a settlement.  The Clerk of Court is respectfully directed

to close the open motion at Docket Number 20.

Dated:      New York, New York
            March 30, 2026

_____
GARY STEIN
United States Magistrate Judge

---

challenging the delegation clause itself or asserting a challenge that could be brought in court under the terms of the Arbitration Provision.  *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 602 (S.D.N.Y. 2020).

[21] "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).  This approach comports with New York and Connecticut law. *See, e.g., Shehadeh v. Horizon Pharma USA, Inc.*, No. 20 Civ. 8107 (AT), 2021 WL 4176254, at *6 (S.D.N.Y. Sept. 14, 2021) (citing 9 U.S.C. § 3; N.Y. C.P.L.R. § 7503(a)); *Bonner v. Point72 Asset Mgmt., L.P.*, No. 18 Civ. 1233 (AT), 2018 WL 11223154, at *3 (S.D.N.Y. July 5, 2018) (citing 9 U.S.C. § 3; Conn. Gen. Stat. Ann. § 52-409).